# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT A. de BY,<br><br>                    Plaintiff,<br><br>     v.<br><br>ALEJANDRO TAYLOR a/k/a ALEX TAYLOR, HORACIO ARECO, AND JOHN DOES 1-10,<br><br>                    Defendants. | CASE NO. 1:20-cv-1280<br><br>**COMPLAINT**<br>**DEMAND FOR JURY TRIAL**<br><br>TRIAL DATE:    None Set |

### Nature of the Action

1.      This is an action for defamation *per se*, intentional infliction of emotional distress, *prima facie* tort, tortious interference with economic relations, coercion, extortion, concerted action liability, and aiding and abetting brought against Defendant Alex Taylor ("Taylor") personally and others who participated in the procurement, creation, composition or publication of Taylor's defamatory statements and the other tortious conduct described in detail in this Complaint.

### Introduction

2.      This action has its genesis in Taylor's role in the aftermath of another, unrelated, defamation action and the victory Plaintiff procured for one of his clients Mr. NC-D.[1]

3.      In December 2014, Mr. NC-D was elected president of the Federation of International Polo ("FIP"), the global governing body for the sport of polo of which all national polo governing bodies are members.

4.      In February 2016, a former member of the FIP Executive Committee accused Mr. NC-D of defamation.  In March 2016, Mr. NC-D was named as the sole defendant in an international

---

[1] Plaintiff has anonymized his former client's name as he is not a party to this action.

libel action the underlying events of which took place and for which evidence and witnesses were located across the world, primarily in the United Kingdom (London), the United States (Los Angeles), and in Argentina (Buenos Aires).

5.       Plaintiff's law firm has offices in both Los Angeles and London, and Plaintiff was familiar with the inner workings of FIP, the general history and many of the facts that gave rise to the defamation action against Mr. NC-D, as well as with many of the personalities involved.  Also, Plaintiff has significant and extensive experience with cross border, international litigations and multi-jurisdictional disputes, and the international polo community and many of its aspects that played a role in the accusations levelled against Mr. NC-D.  Hence, Mr. NC-D asked Plaintiff and his firm Connon Wood LLP to act as his legal counsel in the defamation action and retained Plaintiff to lead and coordinate the preparation of Mr. NC-D's defense.

6.       While Mr. NC-D had been sued, FIP itself was not a defendant in the libel action against Mr. NC-D.

7.       However, the allegedly defamatory statements underpinning the libel action against Mr. NC-D consisted of e-mail messages he had sent while he was FIP's president.

8.       Accordingly, FIP agreed to pay for the fees and cost of Mr. NC-D's defense and of the international legal team Plaintiff was tasked to put together and lead for that purpose.

9.       Taylor is FIP's Chief Executive Officer, and as such is one of only two paid employees, the other being an administrative assistant in the FIP office in Buenos Aires, Argentina. All other FIP officials donate their time to FIP for free.

10.       Neither Taylor nor any of the other Defendants here was a defendant in the defamation action against Mr. NC-D.

11.       Neither Taylor nor any of the other Defendants here is or ever has been a client of Plaintiff or of his firm.

12.       Plaintiff organized, led, and coordinated the international legal team consisting of lawyers and support personnel in London, Los Angeles, and Australia, including local counsel, and instructed the barristers in Australia where, after a jurisdictional dispute had been litigated, the libel

action against Mr. NC-D was ultimately tried in the Supreme Court of Victoria (Melbourne, Australia).

13.    After a four-week long bench trial held during 2018, Mr. NC-D prevailed in his defense and the legal team led by Plaintiff defeated the defamation claims brought against Mr. NC-D when, on June 28, 2019, Justice T. Forest of the Supreme Court of Victoria issued his 171-page judgment rejecting the allegations.

14.    Even before the start of the trial, FIP stopped paying Mr. NC-D's legal fees and costs incurred by the legal team, including those of the junior barristers in Australia whom Plaintiff had instructed with the approval of his client and the consent of FIP.

15.    Despite FIP's breach of the various fee agreements and its repeated promises to pay, and the mounting unpaid legal fees and costs to the tune of hundreds of thousands of dollars, Plaintiff stood by Mr. NC-D and continued his defense without being paid as did, at Plaintiff's request, the junior barristers in Australia tasked with the preparation of the courtroom presentation during trial.

16.    After the trial ended on August 24, 2018, FIP repeatedly promised that it would pay the outstanding and long-overdue legal fees and costs of the Australian junior barristers and Plaintiff's firm, and assured Plaintiff's firm that FIP "has never claimed your firm was not entitled to payment of fees in accordance to the procedures established in our agreement."

17.    During the otherwise civilized, friendly, but rather technical correspondence to resolve the outstanding financial debts owed to the Australian junior barristers and Plaintiff's law firm, over the course of the year following the successful conclusion of the NC-D libel case, Taylor maliciously and falsely accused Plaintiff of serious crimes and fraud, disparaging Plaintiff in his profession and business, and impugned his basic integrity and competence.

### The Parties

18.    Plaintiff Robert A. de By is an individual who is resident in the United States and is domiciled and resides in New York.  Plaintiff has lived in New York since 1987, and he is a Permanent Resident of the United States of America.

19.     Defendant Taylor is an individual who lives and resides in San Isidro, in the Republic of Argentina.  Taylor is a citizen of Argentina.

20.     Defendant Horacio Areco ("Areco") is an individual who lives and resides in Buenos Aires, in the Republic of Argentina.  Areco is a citizen of Argentina

21.     Plaintiff is ignorant of the true names and capacities of Defendants sued herein as Does 1-10, inclusive, and therefore sues those Defendants by such fictitious names.  Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.  Plaintiff is informed and believes and thereon alleges that each of the fictitiously named Defendants is responsible in some manner for the creation, composition or publication of the defamatory statements herein alleged, or has been complicit in Taylor's other tortious conduct herein alleged, and that Plaintiff's damages as herein alleged were proximately caused by their conduct.

## Jurisdiction

22.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) (diversity jurisdiction) because the Defendants are citizens of foreign states while the Plaintiff is a Permanent Resident of the United States who resides and is domiciled in New York City and the amount in controversy exceeds $75,000.

23.     This Court has personal jurisdiction over the Defendants because, on information and belief, the Defendants have had continuous and systematic contacts with this forum as a result of business regularly conducted in this judicial district and thus have sufficient minimum contacts here to permit the exercise of personal jurisdiction.

24.     This Court has personal jurisdiction over the Defendants because the Defendants have committed tortious acts without the state causing injury to person or property within the state while they engage in another persistent course of conduct in the state.

25.     On information and belief, Taylor conducts financial and banking, as well as other business in several states including in New York and maintains bank, investment, deposit, savings, and nominee accounts, and hold and own stocks/bonds/funds/financial instruments through accounts or financial institutions located in New York, including but not limited to (i) Citi Private Bank and Citi Bank, whose offices are located at 153 East 53rd Street, New York, NY 10022, (ii) Itaú Private

Bank and Itaú Bank, whose office is located at 767 Fifth Avenue, 50th Floor, New York, NY 10153-0023, (iii) HSBC Bank as well as its international and private banking divisions and subsidiaries, whose offices are located at 101 Park Avenue, New York, NY 10017, and through affiliated divisions, and through (iv) other banks, brokerages, and financial institutions elsewhere in New York and the United States.  Taylor is the ultimate beneficial owner of the aforementioned accounts/funds/assets and derives substantial revenues from business he conducts in New York.

26.     On information and belief, Areco conducts financial and banking, as well as other business in several states including in New York and maintains bank, investment, deposit, savings, and nominee accounts, and hold and own stocks/bonds/funds/financial instruments through accounts or financial institutions located in New York, and through affiliated divisions and subsidiaries, and financial institutions elsewhere in New York and the United States.  Areco is the ultimate beneficial owner of the aforementioned accounts/funds/assets and derives substantial revenues from business he conducts in New York.

27.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(3) because if there is no district in which an action may otherwise be brought as provided in this section, venue is proper in any judicial district in which any defendant is subject to the Court's personal jurisdiction with respect to such action, while §1391(c)(3) holds that a defendant who is not resident in the United States may be sued in any judicial district.

## The Facts

28.     Plaintiff and Taylor were on friendly terms and spent time together for work as well as socially.  Plaintiff appreciated Taylor's friendship, and Taylor was Plaintiff's guest on many social occasions in London and Buenos Aires and, on a few occasions, *vice versa*.

29.     In the period leading up to and during the trial, as well as afterward when FIP had stopped paying for the costs of Mr. NC-D's defense, Taylor repeatedly told Plaintiff that as soon as the money from FIP's insurer came in, FIP would pay the overdue and outstanding amounts due to the legal team led by Plaintiff, including to the junior Australian barristers and to Plaintiff's firm.

30.     On December 6, 2018, Taylor sent Plaintiff a WhatsApp message: "Money received from [the insurance company]".

31.     However, despite Taylor's repeated promises that FIP would pay the outstanding amounts owed to the legal team as soon as its insurer would make a payment, Taylor subsequently told Plaintiff that he was working on FIP's budget, which include the costs of Taylor's salary and expenses, and that he needed to allocate the money to other budget items instead of the legal team's overdue invoices.

32.     On December 11, 2018, FIP's new President Mr. Horacio Areco invited Plaintiff to a breakfast meeting in Buenos Aires, Argentina.  Over breakfast, Mr. Areco acknowledged FIP's debt and the hard work done by the legal team, and thanked Plaintiff for what had been accomplished, but asked for extra time to pay and for yet another discount.  This despite that the bills were then overdue more than a year, and that FIP had received very significant discounts already.

33.     Later that same day, Taylor came under severe criticism from a senior official in polo because of his salary and position as FIP's Chief Executive Officer, who told Taylor that he should resign.

34.     On December 13, 2018, the day before the FIP General Assembly meeting, Taylor and Plaintiff met for coffee off-site to discuss how to resolve the outstanding bills of the legal team. During their meeting, Taylor told Plaintiff that Taylor was sure that he would get dismissed as FIP's Chief Executive.

35.     Plaintiff commiserated with Taylor's concern that he would get fired but expressed the opinion that he believed Taylor, perhaps, was unduly concerned as the rebuke had come from a single, albeit important, official.  Taylor said he appreciated the support but said his being fired was inevitable.  Plaintiff also, again, urged Taylor to arrange the long-overdue payments to the legal team, including to the junior Australian barristers.  Taylor told Plaintiff that he hoped to be able to resolve the payment situation for the legal team that had successfully defended Mr. NC-D, before Taylor would formally be asked to resign or would be dismissed from FIP.

36.     On December 21, 2018, Plaintiff met with Taylor and Messrs. Horacio Areco (FIP's new president), Marcos Aldao (member of the FIP Executive Committee), and Julian Martinez Youens (member of the FIP Council of Administration), at the FIP office in Buenos Aires and

informed them that the legal team, including the junior Australian barristers, was not able to any longer defer payment of the outstanding invoices.

37.     The week of December 10-14, 2018, and its aftermath, in Buenos Aires with the numerous meetings with Taylor and Areco, endless prevarication and subterfuge aimed at avoiding payment of the legal team, and the intrigue, blaming, accusations, betrayals, and political infighting in which the Defendants engaged and inflicted on Plaintiff made for one of the most stressful periods in Plaintiff's 35-year career.

38.     On the morning of December 30, 2018, Plaintiff had a medical accident and was admitted to the Intensive Care Unit of the Mater Dei Hospital in Buenos Aires where he spent New Year's Eve and remained for several days of treatment and observation.

39.     As it turned out, Taylor had allocated the monies that the insurance company had paid to FIP for the expressly stated purpose of paying the legal team for the defense of Mr. NC-D to other budget items instead.  Successively, Taylor was not fired but managed to retain his salaried position as FIP's CEO.

### Defamatory Statement 1

40.     Subsequently, on February 14, 2019, Taylor wrote to Nicholas Connon, Esq., managing partner at Plaintiff's law firm, falsely and maliciously accusing Plaintiff of fraud and other serious crimes by stating that Plaintiff had "billed for issues unrelated to the Defamation matter" during the defense of the defamation action against Mr. NC-D ("Defamatory Statement 1").

41.     Taylor's Defamatory Statement 1 was made of and concerning Plaintiff because Plaintiff was the partner in charge of the defense of the defamation action against Mr. NC-D and handled, and was responsible for, his firm's billing with regard to the same.  As a result, Mr. Connon and others accurately and reasonably understood Defamatory Statement 1 to refer to Plaintiff as he had responsibility for invoicing and billing.

42.     The defamatory imputations include, but are not limited to, the imputations that Plaintiff committed a serious crime and is guilty of fraud, billing fraud, honest services fraud, grand larceny, falsifying business records, mail fraud, and wire fraud.

43.     Taylor's Defamatory Statement 1 and its imputations tend to injure and did injure Plaintiff in his profession and business by imputing to him serious crimes as well as misconduct and unfitness in the exercise of his profession and business by accusing him of unethical conduct, dishonesty, deceit, lack of integrity, and unsuitability to his profession.

44.     Taylor's Defamatory Statement 1 is neither figurative nor extreme, and it is sufficiently precise such that it is capable of being proven true or false.

45.     Taylor's Defamatory Statement 1 is so factual and precise as to specify the following specific crimes as well as others and, in the alternative, in any event contains innuendo that implies, insinuates, intimates, suggests, hints at, and alludes to Plaintiff having committed or attempting to commit one or more of the crime as set out below and others.

46.     A scheme to defraud.  A serious crime defined as constituting a systematic ongoing course of conduct with intent to defraud by false or fraudulent pretenses, punishable pursuant to N.Y. Penal Law §190.65(1).

47.     Grand larceny.  A serious crime and felony punishable pursuant to N.Y. Penal Law §§155.30, 155.35, 155.40, and 155.42.

48.     Falsifying business records in the first degree.  A serious crime and felony punishable pursuant to N.Y. Penal Law §175.10.

49.     Mail fraud.  A serious crime and felony punishable pursuant to 18 U.S.C. §1341.

50.     Wire fraud.  A serious crime and felony punishable pursuant to 18 U.S.C. §1343.

51.     Honest services fraud.  A serious crime and felony punishable pursuant to 18 U.S.C. §1346.

52.     Plaintiff has been practicing law for over 33 years combined in various jurisdictions, both in the United States and abroad, without a single client or disciplinary complaint and has never been accused of or charged with a crime.

53.     Taylor made his gratuitous, false Defamatory Statement 1 with the sole purpose of common-law malice in that he made it out of spite and ill will towards Plaintiff.  Had Taylor known about fees or costs that were improperly billed, on information and belief, Taylor would have tried to reduce the amounts due by identifying such items – especially after he was challenged and offered

an opportunity to do so when on February 18, 2019, Mr. Connon wrote Taylor: "this is the first time that I have heard any accusation that there is any irregularity regarding Mr. de By's billing or any of the invoices. I ask you to please identify the specific items billed by Mr. de By that you contend are 'for issues unrelated to the Defamation matter'."

54. However, Taylor failed to identify a single improper billing item or entry. On information and belief, Taylor's Defamatory Statement 1 served no practical or other legitimate purpose and was made solely out of spite and ill will towards Plaintiff.

55. Taylor made Defamatory Statement 1 a mere two weeks after FIP's President and FIP's Executive Committee had written to Mr. Connon, on January 31, 2019: "We are very sorry for the health problems that your partner, and our friend and legal advisor, Robert is suffering, and we hope for his speedy recovery".

56. On information and belief, Taylor was fully aware that Plaintiff had just had a medical accident and that Taylor had no legitimate motive for his Defamatory Statement 1 a mere two weeks later, and he made Defamatory Statement 1 solely out of spite and ill will.

57. On information and belief, Taylor's spite and ill will were inspired by the lawyers' insistence that the legal team that had defended Mr. NC-D be paid the overdue fees and costs incurred

58. On information and belief, Taylor's spite and ill will were inspired by the junior Australian barristers' and Plaintiff's insistence on payment while Mr. NC-D was no longer FIP's president, nothing more was to be gained for FIP or Taylor by paying now that the defense had been successful, and because as being responsible for FIP's finances Taylor – who is one of only two salaried employees at FIP – resented any financial pressure that might result or concomitant attention that might draw to his salary and position, in light of earlier criticism from within the polo community as well as from Justice Forest in his judgment in the NC-D case with regard to Taylor's lack of financial acumen.

59. Taylor made his gratuitous, false defamatory statement with Constitutional or actual malice in that Taylor made his statement while he knew it was false or with a high degree of awareness of its probable falsity or while Taylor in fact entertained serious doubts as to its truth.

60.     Taylor failed to identify, nor attempted to identify, any fee or cost item that had been billed incorrectly, as he had charged in his Defamatory Statement 1, despite being asked and given the opportunity to do so.  On information and belief, Taylor knew that no such incorrect billing items exist and that his accusation was false when he made it.

61.     On information and belief, Taylor composed and created Defamatory Statement 1 with the cooperation and assistance of Areco and Defendants John Does 1-10, who assisted Taylor in drafting, typing, printing, filing and mailing the letter containing Defamatory Statement 1.

62.     On January 24, 2020, counsel in this case requested Areco to clarify his position and involvement given that Taylor had made his Defamatory Statements on FIP letterhead, and as Areco as president of FIP is Taylor's immediate superior and they work together.  Areco was asked whether "it is your position that you did not know about and had no involvement in Mr. Taylor making his Defamatory Statements" and, if so, "that you set out your position in an unsworn declaration under penalty of perjury in the form prescribed by 28 U.S. Code §1746(1) – *i.e.*, with the attestation 'I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date). (Signature)'. . . no later than by the close of business on January 31, 2020, please?"

63.     Areco has refused to provide a statement that he did not know about and was not involved in Taylor's conduct described in detail in this Complaint.

64.     Plaintiff has played polo since 1996 and is an active member of the international polo community by virtue of having played polo for over 24 years, being a playing member over the years at various prominent polo clubs, and his various other social and professional activities in connection with the sport of polo.

65.     In addition to the publication to Mr. Connon and Connon Wood LLP, on information and belief, Taylor and the other Defendants published Defamatory Statement 1 to the members of the FIP Executive Committee, by showing them drafts of the defamatory statement, making the statement orally during meetings and over the telephone and via e-mail, and by sharing and publishing the near-final and final Defamatory Statement 1, including to Messrs. Stephen Hutchinson, former Chairman of the Hurlingham Polo Association ("HPA"), the U.K.'s national

governing body, Bob Puetz, Chief Executive of the United States Polo Associations ("USPA"), Marcos Aldao, Chief Executive of the Argentine Polo Association ("AAP)", François Berger, and Pierot Dillier, and also to Plaintiff's client Mr. NC-D, as well as to others in the administration of FIP and beyond, including persons working in the FIP office in Buenos Aires, Argentina, all of whom are prominent members of the international polo community to which Plaintiff belongs, also, and a number of whom are long-standing social acquaintances or friends of Plaintiff, and a number of whom work(ed) with Plaintiff professionally.

### Defamatory Statement 2

66.     On December 22, 2019, Taylor wrote a letter addressed to Plaintiff and Connon Wood LLP in which Taylor falsely and maliciously accused Plaintiff of engaging in "ex post facto attempts to malign your clients" ("Defamatory Statement 2").

67.     Taylor's Defamatory Statement 2 tends to injure and did injure Plaintiff in his profession and business by imputing to him misconduct and unfitness in the exercise thereof.

68.     Taylor's Defamatory Statement 2 was made of and concerning Plaintiff because Taylor spoke of "your ex-post facto attempts" while Taylor was referring to Plaintiff, hence those to whom Taylor published his Defamatory Statement 2 accurately and reasonably understood it to refer to Plaintiff.

69.     Taylor's Defamatory Statement 2 is neither figurative nor extreme and is sufficiently precise such that it is capable of being proven true or false.

70.     Taylor made his gratuitous, false Defamatory Statement 2 with the sole purpose of common-law malice in that he made it out of spite and ill will towards Plaintiff.

71.     Taylor made his false Defamatory Statement 2 with Constitutional or actual malice in that Taylor made his statement while he knew it was false or with a high degree of awareness of its probable falsity or while Taylor in fact entertained serious doubts as to its truth.

72.     Taylor was in possession of Justice Forest's judgment and, on information and belief, Taylor had read that judgment and thus knew that rather than malign clients, Plaintiff had simply been referring to Justice Forest's unflattering findings about Taylor and others when Plaintiff had explained why Mr. NC-D had not prevailed on his counterclaim.

73. Taylor had tried to excuse FIP's failure to pay for Mr. NC-D's defense by reference to the counterclaim brought by Mr. NC-D. In response, Plaintiff had explained to FIP and Taylor that, not only had the legal team defeated the defamation allegations levelled against Mr. NC-D, but also that the legal team had succeeded in establishing on Mr. NC-D's counterclaim that he had been defamed by an accusation of financial mismanagement. Or, as Justice Forest of the Supreme Court of Victoria in Melbourne (Australia) had put it in his judgment, the allegations against Plaintiff's client had been "patently defamatory of NC-D". In this context, Plaintiff had explained to FIP, also, that the success in establishing the defamation underlying Mr. NC-D's counterclaim had been undone, and that the counterclaim brought on behalf of Mr. NC-D had ultimately been lost, because of Taylor's prior conduct which had given rise to the defense of truth and justification.

74. Or, as Justice Forest had put it in his judgment: "AT [Alex Taylor] was primarily responsible for the management of FIP's finances, but I consider that the president [NC-D] . . . cannot reasonably avoid responsibility . . . AT . . . [was] not commercially competent" and hence Justice Forest had held that "NC-D must have known this financial incompetence". Thus, Taylor's "financial incompetence", as found by the Court, had given rise to a defense of truth and justification for the defamatory allegation of financial mismanagement levelled against Mr. NC-D and resulted in the loss of his counterclaim.

75. Thus, Plaintiff had not maligned any clients. Plaintiff had merely pointed out Justice Forest's reference to Taylor and Mr. NC-D in the judgment and Taylor's role in the loss of the counterclaim in that prior case, without expressing any opinion about the judgment or Court's findings, and only after Taylor had tried to excuse the non-payment of the invoices of the Australian junior barristers and Plaintiff's firm on the basis of the counterclaim not having succeeded.

76. On information and belief, Taylor had been provided with a copy and was fully aware of Justice Forest's judgment and findings. Therefore, Taylor knew that Plaintiff was not maligning his clients, and Taylor knew that Plaintiff had merely referred to Justice Forest's judgment which was disapproving of Taylor – who never was a client of Plaintiff or his firm – without Plaintiff himself expressing any opinion on Justice Forest's finding in his judgment that Taylor was "commercially incompetent" or regarding Mr. NC-D.

77.     Upon information and believe Taylor composed and created Defamatory Statement 2 with the approval, cooperation, and assistance Areco and of Defendants John Does 1-10, who assisted Taylor in composing, drafting, typing, printing, filing and mailing the letter containing Defamatory Statement 2.

78.     Upon information and belief, Taylor and the other Defendants published Defamatory Statement 2 to the members of the FIP Executive Committee, by showing them drafts of the defamatory statement, making the statement orally during meetings and over the telephone and via e-mail, and by sharing and publishing the near-final and final Defamatory Statement 2, including to Messrs. Stephen Hutchinson, former Chairman of the Hurlingham Polo Association ("HPA"), the U.K.'s national governing body, Bob Puetz, Chief Executive of the United States Polo Associations ("USPA"), Marcos Aldao, Chief Executive of the Argentine Polo Association ("AAP")", François Berger, and Pierot Dillier, and also to Plaintiff's client Mr. NC-D, as well as to others in the administration of FIP and beyond, including persons working in the FIP office in Buenos Aires, Argentina, all of whom are prominent members of the international polo community to which Plaintiff belongs also, and a number of whom are long-standing social acquaintances or friends of Plaintiff, and a number of whom work(ed) with Plaintiff professionally.

## **Defamatory Statement 3**

79.     On December 22, 2019, Taylor wrote a letter addressed to Plaintiff and Connon Wood LLP in which Taylor falsely and maliciously accused Plaintiff of serious crimes by stating that it is a "fact that at one point you suggested that we make misrepresentations to the insurance company to the effect that the court proceedings had been interrupted based on the debt to the attorneys" ("Defamatory Statement 3").

80.     Taylor's Defamatory Statement 3 was made of and concerning Plaintiff because Taylor spoke of "you suggested" while referring to Plaintiff.

81.     Defamatory Statement 3 is false because Plaintiff never suggested that Taylor or anyone else make a misrepresentation to the insurance company.  Instead, FIP's continued failure to pay the legal team had led to serious problems with members of the legal team, including with the senior QC (Queen's Counsel) in Australia, who had made clear to Taylor and to Plaintiff, repeatedly,

that the overdue and unpaid legal fees and costs, including those of the junior barristers, running into hundreds of thousands of dollars, might endanger, and were endangering, counsels' ability and willingness to continue preparing for and conducting Mr. NC-D's defense and trial.

82.     Plaintiff shared and discussed these concerns with Taylor as, on information and belief, did other members of the legal team.

83.     In reality, there existed a very significant risk that the lawyers would not continue with the trial if they did not get paid, while unpaid bills had been stacking up, including those of the junior Australian barristers.  That was the risk that Plaintiff and Taylor discussed and that Plaintiff had wanted to inform the insurance company of because, had it come to pass and had the lawyers not gone forward, Mr. NC-D's defense and case would have been irretrievably damaged with very serious negative financial consequences for the insurance company (and for Plaintiff's client Mr. NC-D personally and, ultimately, for FIP).

84.     Such a development may have led to a (default) judgment against Mr. NC-D, awarding substantial damages and an Order for Costs to pay the other side's legal expenses and costs, which would have amounted to hundreds of thousands of dollars, if not well in excess of a million dollars for costs and legal fees alone, for most if not all of which the insurance company would have been responsible.

85.     The defamatory imputations of Defamatory Statement 3 include, but are not limited to, the imputations that Plaintiff committed serious crimes and is guilty of fraud, insurance fraud, grand larceny, mail fraud, wire fraud, and other serious crimes.

86.     Taylor's Defamatory Statement 3 and its imputations tend to injure and did injure Plaintiff in his profession and business by imputing to him serious crimes as well as misconduct and unfitness in the exercise of his profession and business by accusing him of unethical conduct, dishonesty, deceit, lack integrity, and unsuitability to his profession.

87.     Taylor's Defamatory Statement 3 is neither figurative nor extreme, and it is sufficiently precise such that it is capable of being proven true or false.

88.     Taylor's Defamatory Statement 3 is so factual and precise as to specify the following specific crimes as well as others and, in the alternative, in any event contains innuendo that implies,

insinuates, intimates, suggests, hints at, and alludes to Plaintiff having committed one or more of the crime as set out below or others.

89.     A scheme to defraud.  A serious crime defined as constituting a systematic ongoing course of conduct with intent to defraud by false or fraudulent pretenses, punishable pursuant to N.Y. Penal Law §190.65(1).

90.     Insurance fraud.  A serious crime and felony punishable pursuant to N.Y. Penal Law §§176.10, 176.15, 176.20, 176.25 and 176.30.

91.     Grand larceny.  A serious crime and felony punishable pursuant to N.Y. Penal Law §§155.30, 155.35, 155.40, and 155.42.

92.     Mail fraud.  A serious crime and felony punishable pursuant to 18 U.S.C. §1341.

93.     Wire fraud.  A serious crime and felony punishable pursuant to 18 U.S.C. §1343.

94.     Plaintiff has been practicing law for over 33 years combined in various jurisdictions, both in the United States and abroad, without a single client or disciplinary complaint and has never been accused of or charged with a crime.

95.     Taylor made Defamatory Statement 3 while he knew that Plaintiff had recently had a medical accident and had been hospitalized in the Intensive Care Unit.  Taylor's statement and conduct were wanton, cruel, malicious, reckless, and designed to and did cause Plaintiff severe emotional distress, personal humiliation, mental anguish and suffering.

96.     Upon information and belief, Taylor composed and created Defamatory Statement 3 with the cooperation and assistance of Areco and Defendants John Does 1-10, who assisted Taylor in drafting, typing, printing, filing and mailing the letter containing Defamatory Statement 3.

97.     Upon information and belief, Taylor and the other Defendants published Defamatory Statement 3 to the members of the FIP Executive Committee, by showing them drafts of the defamatory statement, making the statement orally during meetings and over the telephone and via e-mail, and by sharing and publishing the near-final and final Defamatory Statement 3, including to Messrs. Stephen Hutchinson, former Chairman of the Hurlingham Polo Association ("HPA"), the U.K.'s national governing body, Bob Puetz, Chief Executive of the United States Polo Associations ("USPA"), Marcos Aldao, Chief Executive of the Argentine Polo Association ("AAP)", François

Berger, and Pierot Dillier, and also to Plaintiff's client Mr. NC-D, as well as to others in the administration of FIP and beyond, including persons working in the FIP office in Buenos Aires, Argentina, all of whom are prominent members of the international polo community to which Plaintiff belongs also, and a number of whom are long-standing social acquaintances or friends of Plaintiff, and a number of whom work(ed) with Plaintiff professionally.

### Intentional Infliction of Emotional Distress

98.     In February 2018, Taylor falsely accused Plaintiff of serious crimes, including  fraud, billing fraud, honest services fraud, grand larceny, falsifying business records, mail fraud, and wire fraud, while Tylor knew that Plaintiff had very recently had a medical accident and was hospitalized in the Intensive Care Unit in the Mater Dei Hospital in Buenos Aires, Argentina.

99.     A mere two weeks before Taylor engaged in this extreme and outrageous conduct, FIP's President and Executive Committee had written Plaintiff's managing partner Mr. Connon on January 31, 2019: "We are very sorry for the health problems that your partner, and our friend and legal advisor, Robert is suffering, and we hope for his speedy recovery."  Taylor knew of Plaintiff's medical condition and precarious situation, in which severe stress can literally be deadly and, thus, Taylor acted intentionally.

100.     On February 18, 2019, Mr. Connon wrote to Mr. Taylor, referring to his accusations of serious crimes against Plaintiff, and told him: "That you make that accusation about Mr. de By, who is an attorney with a sterling reputation and over 33 years of experience practicing law without a single client-complaint, ever – and while you know that he recently [had a medical accident] – is so beyond the pale as to defy words . . . In fact, it is malicious.  If, upon further reflection, you would like to withdraw this serious accusation, I would like to give you the opportunity to do so."

101.     Nevertheless, Taylor failed to identify a single instance during Plaintiff's defense of Mr. NC-D between February 2016 until the end of August 2018 in which Plaintiff billed "for issues unrelated to the Defamation matter".  Taylor also failed to withdraw his serious false accusation, despite having been offered an opportunity to do so, intentionally adding further to Plaintiff's severe emotional distress.

102.    Rather than take Mr. Connon's warning to heart, on information and belief, Taylor maintained the false accusations and refused to withdraw them with the intention to cause Plaintiff further and continuing severe emotional distress.

103.    Taylor made no further inquiries as to Plaintiff's health.  Thus, Taylor was unaware of whether Plaintiff had recovered or suffered permanent damage to his health.  Callously indifferent as to whether Plaintiff had suffered any permanent and debilitating medical effects, not even a year later, Taylor in December 2019 again made extreme and outrageous false accusations against Plaintiff by accusing him, again, of serious crimes, intentionally inflicting additional severe emotional distress on Plaintiff.  This time accusing Plaintiff of fraud, insurance fraud, grand larceny, mail fraud, wire fraud, and other serious crimes.

104.    Taylor's engaging in serial false accusations of serious crimes, over time, repeatedly, and refusing to back up those accusations with facts when asked to do so, is extreme and outrageous conduct in light of Plaintiff's medical condition and circumstances.  In making his false accusations, Taylor subjected Plaintiff to abuse and public humiliation in front of a large group of people, consisting of members of the polo community who knew Plaintiff socially and professionally, as Taylor made his false accusations public.

105.    Taylor's conduct was designed inflict severe emotional distress on Plaintiff, and it shows acts of intentional callousness toward Plaintiff.

106.    That Taylor made the myriad false accusation of serious crimes while Plaintiff and his legal team had prevailed in Mr. NC-D's defense, only adds to the extreme and outrageous character of Taylor's conduct as cruel and wanton.  Taylor's false accusation show that he intentionally inflicted severe emotional distress on Plaintiff with depraved indifference to Plaintiff's medical condition.

107.    Taylor's repeated false accusations of serious crimes, over a period of nearly a year, constitute a longstanding campaign of deliberate, systematic, and malicious treatment of Plaintiff.

### Coercion and Extortion

108.    On information and belief, Taylor's conduct as described in detail in this Complaint, including but not limited to Taylor's Defamatory Statements, was intended to coerce Plaintiff to stop

assisting the Australian junior barristers and his firm in obtaining payment for the work done and expenses incurred in the defense of Mr. NC-D.

109.    On information and belief, Taylor accused Plaintiff of crimes in order to compel or induce Plaintiff to give up on his pursuit to obtain payment for the legal team that had defended Mr. NC-D by instilling in Plaintiff the fear that if he continued to insist that the Australian junior barristers and his firm be paid, Taylor may continue to accuse him of crimes or cause criminal charges to be instituted against Plaintiff.

110.    Likewise, Taylor asserted facts that, whether true or false, tended to subject Plaintiff to contempt among those to whom Taylor publicized and made his Defamatory Statements and accusations, insinuations, allusions, and whispers with the aim to install fear so as to coerce Plaintiff to stop assisting the junior barristers in Australia and his firm.

111.    Taylor's assertions in this regard went beyond his Defamatory Statements and included threats and allusions that Plaintiff was improperly or inappropriately pursuing payment, that his firm was not legitimately entitled to payment of the overdue amounts, that Plaintiff did not have the best interests of FIP at heart despite the hundreds of hours of *pro bono* work that Plaintiff did for the organization, and other disparaging remarks meant to dissuade Plaintiff from continuing to insist that the Australian junior barristers and his firm be paid.

112.    While Taylor's actions pled in this Complaint may not have materially benefitted Taylor himself, they were calculated to materially harm Plaintiff with respect to his business, calling, career, financial condition, reputation.

113.    Taylor's accusations of criminal behavior and utterances aimed at subjecting Plaintiff to disapproval and contempt, and other acts described in detail in this Complaint harming Plaintiff with respect to his business, calling, career, financial condition, reputation or personal relationships were aimed at swaying, influencing or convincing Plaintiff to persuade his firm and the Australian junior barristers to stop pursuing payment, or to forego it altogether or in part, such as via Areco's requests for additional discounts.

114.    Hence Taylor's conduct was meant to install fear in Plaintiff so as to compel or induce him to deliver a financial benefit to Taylor's employer, a third person, so as to benefit Taylor indirectly.

## FIRST CAUSE OF ACTION FOR DEFAMATION *PER SE*

### (Against All Defendants)

115.    Plaintiff reasserts and re-alleges the allegations set forth above.

116.    Taylor defamed Plaintiff by his Defamatory Statements 1 through 3.

117.    Defamatory Statements 1 through 3 are false.

118.    Defamatory Statements 1 through 3 constitute defamation *per se* because they accuse Plaintiff of a serious crime.

119.    Defamatory Statements 1 through 3 constitute defamation *per se* because they tend to injure Plaintiff in his professions or business.

120.    In making his defamatory statements, Taylor acted with the requisite malice in that he made those Defamatory Statements, and each one of them, with the sole purpose of common-law malice in that he made the Defamatory Statements out of spite and ill will towards the Plaintiff.

121.    In making his defamatory statements Taylor acted with the requisite malice in that he made those Defamatory Statements, and each one of them, with Constitutional or actual malice in that Taylor made Defamatory Statements 1 through 3, and each one of them, while he knew each statement was false or with a high degree of awareness of its probable falsity or while Taylor in fact entertained serious doubts as to their truth.

122.    Defendant's Defamatory Statements 1 through 3 and their accusatory words specify specific crimes, or in any event crimes are readily apparent from the innuendo in Defendant's Defamatory Statements as pled in this Complaint.

123.    Taylor's Defamatory Statements 1 through 3 are neither figurative nor extreme, do not constitute hyperbole, and are not statement of opinion but are sufficiently precise such that each one of them is capable of being proven true or false.

124.    Upon information and believe Taylor composed and created Defamatory Statements 1 through 3 with the cooperation and assistance of Areco and Defendants John Does 1-10, who

assisted Taylor in composing and drafting the Defamatory Statements and with typing, printing, filing and mailing the letters containing Defamatory Statement 1 through 3.

125.    Taylor and Defendants published his Defamatory Statements 1 through 3 widely in the community, as pled in this Complaint.

126.    As a proximate and direct cause of Taylor's Defamatory Statements, Plaintiff suffered damages, the exact amount to be determined at trial.

127.    Taylor's conduct was knowing, willful, intentional or deliberate wrongdoing, malicious and reprehensible and carried out with an evil motive, or a conscious act that willfully and wantonly disregarded Plaintiff's rights, intended to cause and that, in fact, did cause Plaintiff to suffer harm.  As a result, Plaintiff is entitled to punitive damages in an amount to be determined at trial appropriate to deter further such conduct.

## SECOND CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against All Defendants)

128.    Plaintiff reasserts and re-alleges the allegations set forth above.

129.    Taylor engaged in extreme and outrageous conduct against Plaintiff as pled in this Complaint.  Taylor's conduct was extreme and outrageous as measured by the reasonable bounds of decency so as to be as to be utterly intolerable in a civilized society.

130.    Taylor behaved in the manner set forth in this Complaint with the intent to cause or in disregard of the substantial probability of causing Plaintiff severe emotional distress as pled in this Complaint.

131.    Taylor's outrageous conduct and false accusations of serious crimes, his failure to withdraw those accusations, and his refusal to provide proof or specifics of the same when given the opportunity to do so, was the direct and proximate cause of Plaintiff's suffering severe emotional distress.

132.    Taylor continued his false accusations and added to them over time, and thus he engaged in a sustained, deliberate, systematic, and malicious attack on Plaintiff in full knowledge that he had a medical accident for which he was hospitalized.

133.    As a result of Taylor's conduct described in this Complaint, Plaintiff suffered severe emotional distress.

134.    Defendants' conduct was knowing, willful, intentional or deliberate wrongdoing, malicious and reprehensible and carried out with an evil motive, or a conscious act that willfully and wantonly disregarded Plaintiff's rights, intended to cause and that, in fact, did cause Plaintiff to suffer harm.  As a result, Plaintiff is entitled to punitive damages in an amount to be determined at trial appropriate to deter further such conduct.

### THIRD CAUSE OF ACTION FOR PRIMA FACIE TORT

### (In the Alternative, Against All Defendants)

135.    Plaintiff reasserts and re-alleges the allegations set forth above.

136.    Defendants through their conduct intentionally inflicted harm on Plaintiff, without justification or excuse, as pled in detail in this Complaint.

137.    As a proximate and direct cause of Defendants' conduct, Plaintiff suffered damage, the exact amount of such damages to be determined at trial.

138.    Defendants acted without excuse or justification.

139.    Defendants committed their prima facie tort through an act or acts that would otherwise be lawful but, by acting together with and in combination with Taylor and each other, and with knowledge of Taylor's wrongdoing, committed a tort.

140.    On information and belief, Defendants' conduct was knowing, willful, intentional or deliberate wrongdoing, malicious and reprehensible and carried out with a fraudulent or evil motive, or a conscious act that willfully and wantonly disregarded Plaintiff's rights, intended to cause and that, in fact, did cause Plaintiff to suffer harm.  As a result, Plaintiff is entitled to punitive damages in an amount to be determined at trial appropriate to deter further such conduct.

### FOURTH CAUSE OF ACTION FOR TORTIOUS INTERFERENCE

### WITH ECONOMIC RELATIONS

### (Against All Defendant)

141.    Plaintiff reasserts and re-alleges the allegations set forth above.

142.    Plaintiff is a partner in the law firm of Connon Wood LLP.

143.     Taylor used wrongful means to induce or cause disruption to the relationship between the firm and Plaintiff through Taylor's conduct, pled in detail in this Complaint.

144.     The injury Taylor caused Plaintiff by attempting to convince his firm that he was guilty of serious crimes, and to try and encourage the firm to reprimand him, by unlawful means, or without justifiable cause, is an actionable wrong.

145.     Taylor's false accusations of criminal behavior against Plaintiff were intended to dissuade Plaintiff from pursuing payment of the long-overdue fees and costs and, thus, to interfere with the economic relations between Plaintiff and his firm as well as between Plaintiff and the Australian junior barristers.

146.     By engaging in the conduct alleged above, as pled in detail in this Complaint, Taylor and the other Defendants interfered with Plaintiff's economic relations with his firm and Australian colleagues through wrongful means.

147.     As a proximate and direct cause of Defendants' tortious interference, Plaintiff suffered damage, the exact amount to be determined at trial.

148.     Taylor's and the other Defendants' conduct was knowing, willful, intentional or deliberate wrongdoing, malicious and reprehensible and carried out with a fraudulent or evil motive, or a conscious act that willfully and wantonly disregarded Plaintiff's rights, intended to cause and that, in fact, did cause Plaintiff to suffer harm.  As a result, Plaintiff is entitled to punitive damages in an amount to be determined at trial appropriate to deter further such conduct.

## FIFTH CAUSE OF ACTION FOR COERCION

### (Against All Defendant)

149.     Plaintiff reasserts and re-alleges the allegations set forth above.

150.     Taylor's false accusations of criminal behavior against Plaintiff were intended to induce Plaintiff to dissuade the Australian junior barristers and Plaintiff's firm from pursuing payment of long-overdue fees and costs owed by Taylor's employer.

151.     Taylor's conduct fits the crime of coercion on the third degree because N.Y. Penal Law §135.60 states, in relevant part: "A person is guilty of coercion in the third degree when he or she compels or induces a person to . . . abstain from engaging in conduct in which he or she has a

legal right to engage . . . by means of instilling in him or her a fear that, if the demand is not complied with, the actor or another will: . . . 4. Accuse some person of a crime or cause criminal charges to be instituted against him or her;  or . . . 5. . . . publicize an asserted fact, whether true or false, tending to subject some person to . . . contempt . . . ; or . . . 9. Perform any other act which would not in itself materially benefit the actor but which is calculated to harm another person materially with respect to his . . . business, calling, career, financial condition, reputation."

152.     By engaging in the conduct alleged above, as pled in detail in this Complaint, Taylor and the other Defendants engaged in coercion of Plaintiff.

153.     As a proximate and direct cause of Defendants' coercion, Plaintiff suffered damage, the exact amount to be determined at trial.

154.     Taylor's and the other Defendants' conduct was knowing, willful, intentional or deliberate wrongdoing, malicious and reprehensible and carried out with a fraudulent or evil motive, or a conscious act that willfully and wantonly disregarded Plaintiff's rights, intended to cause and that, in fact, did cause Plaintiff to suffer harm.  As a result, Plaintiff is entitled to punitive damages in an amount to be determined at trial appropriate to deter further such conduct.

## SIXTH CAUSE OF ACTION FOR EXTORTION

### (Against All Defendant)

155.     Plaintiff reasserts and re-alleges the allegations set forth above.

156.     Taylor's false accusations of criminal behavior against Plaintiff were intended to compel or induce Plaintiff to dissuade his firm or the Australian junior barristers from pursuing payment of long-overdue fees by Taylor's employer.

157.     Hence, Taylor's false accusations of criminal behavior were intended to compel or induce Plaintiff to indirectly deliver a substantial financial benefit to Taylor's employer, a third person.

158.     N.Y. Penal Law §155.05(2)(e) states, in relevant part: "A person obtains property by extortion when he compels or induces another person to deliver such property . . . to a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will: . . . (iv) Accuse some person of a crime . . . (v) . . . publicize an asserted fact, whether true or false,

tending to subject some person to . . . contempt . . . (ix) Perform any other act which would not in itself materially benefit the actor but which is calculated to harm another person materially with respect to his . . . business, calling, career, financial condition, reputation or personal relationships".

159.    By engaging in the conduct alleged above, as pled in detail in this Complaint, Taylor and the other Defendants engaged in extortion.

160.    As a proximate and direct cause of Defendants' extortion, Plaintiff suffered damage, the exact amount to be determined at trial.

161.    Taylor's and the other Defendants' conduct was knowing, willful, intentional or deliberate wrongdoing, malicious and reprehensible and carried out with a fraudulent or evil motive, or a conscious act that willfully and wantonly disregarded Plaintiff's rights, intended to cause and that, in fact, did cause Plaintiff to suffer harm.  As a result, Plaintiff is entitled to punitive damages in an amount to be determined at trial appropriate to deter further such conduct.

## SEVENTH CAUSE OF ACTION FOR CONCERTED ACTION LIABILITY

### (Against All Defendants)

162.    Plaintiff reasserts and re-alleges the allegations set forth above.

163.    As set forth in detail above, the Defendants had an understanding express or tacit, to participate in a common plan or design to commit a tortious act, including but not limited to the making of defamatory statements, infliction of emotional distress, prima facie tort, tortious interference with economic relations, coercion, and extortion.

164.    Each of the Defendants acted tortiously and, at least, one of the Defendants committed an act that constitutes a tort in pursuance of the agreement.

165.    The other Defendants in pursuance of their common plan or design to commit a tortious act, actively took part in it, or furthered it by cooperation or request, or lend aid or encouragement to the wrongdoer as pled in detail in this Complaint.

166.    As described, the other Defendants knew the wrongful nature of the primary actor's conduct and intended to aid in the commission of the underlying tort and the Defendants are jointly and severally liable.

167.     As a proximate and direct cause of Defendants' conduct, Plaintiff suffered damage, the exact amount to be determined at trial.

168.     On information and belief, Defendants' conduct was knowing, willful, intentional or deliberate wrongdoing, malicious and reprehensible and carried out with a fraudulent or evil motive, or a conscious act that willfully and wantonly disregarded Plaintiff's rights, intended to cause and that, in fact, did cause Plaintiff to suffer harm.  As a result, Plaintiff is entitled to punitive damages in an amount to be determined at trial appropriate to deter further such conduct.

## EIGHTH CAUSE OF ACTION FOR AIDING AND ABETTING

### (Against All Defendants)

169.     Plaintiff reasserts and re-alleges the allegations set forth above.

170.     On information and belief, the Defendants had actual and complete knowledge of all the wrongful and illegal activities of Taylor pled in detail in this Complaint.

171.     Defendants knowingly participated in and provided substantial assistance in the commission of those activities and conduct related thereto.

172.     At no time did Defendants attempt to stop such tortious, wrongful or illegal conduct.

173.     In fact, the Defendants encouraged and participated in such conduct for their own benefit and Defendants are jointly and severally liable for the damages stemming from their conduct.

174.     In particular, Defendants aided and abetted the wrongful acts committed by Taylor as pled in detail in this Complaint, while Defendants were aware of Taylor's role in the overall tortious or illegal activities at the time, and Defendants knowingly and substantially assisted the primary violations committed by Taylor as pled in this Complaint.

175.     As a proximate and direct cause of Defendants' conduct, Plaintiff suffered damage, the exact amount to be determined at trial.

176.     On information and belief, Defendants' conduct was knowing, willful, intentional or deliberate wrongdoing, malicious and reprehensible and carried out with a fraudulent or evil motive, or a conscious act that willfully and wantonly disregarded Plaintiff's rights, intended to cause and that, in fact, did cause Plaintiff to suffer harm.  As a result, Plaintiff is entitled to punitive damages in an amount to be determined at trial appropriate to deter further such conduct.

WHEREFORE, Plaintiff prays for judgment as follows:

1.    As to the First Cause of Action (defamation *Per Se*),

    a.    Presumed damages in an amount to be determined at trial in excess of $250,000 for each of the Defamatory Statements 1 through 3;

    b.    Compensatory damages, with the specific amount to be determined at trial for each of the Defamatory Statements 1 through 3;

    c.    Punitive damages in an amount to be determined at trial equal to or in excess of $1,000,000 for each Defamatory Statement or aggregate punitive damages equal to or in excess of $3,000,000;

    d.    Costs of suit; and

    e.    Such other and further relief as the Court may deem appropriate.

2.    As to the Second Cause of Action (IIED), in addition,

    a.    Compensatory damages, with the specific amount to be determined at trial of no less than $250,000;

    b.    Punitive damages in an amount to be determined at trial equal to or in excess of $1,000,000;

    c.    Costs of suit; and

    d.    Such other and further relief as the Court may deem appropriate.

3.    As to the Third Cause of Action (prima facie tort), in addition,

    a.    Compensatory damages, with the specific amount to be determined at trial of no less than $250,000;

    b.    Punitive damages in an amount to be determined at trial equal to or in excess of $1,000,000;

    c.    Costs of suit; and

    d.    Such other and further relief as the Court may deem appropriate.

4.    As to the Fourth through Eighth Causes of Action (tortious interference with economic relations, coercion, extortion, concerted action liability, and aiding and abetting), as to each Cause of Action, in addition,

a.      Compensatory damages, with the specific amount to be determined at trial of no less than $250,000 for each cause of action;

b.      Punitive damages in an amount to be determined at trial equal to or in excess of $1,000,000 for each cause of action;

c.      Costs of suit; and

d.      Such other and further relief as the Court may deem appropriate.


DATED:      New York, New York
                February 12, 2020


                       LAW OFFICE OF JOHN V.N. PHILIP, ESQ.
                       By:
                             /s/

                       _____
                       JOHN V.N. PHILIP (Bar # JP-4920)

                       *Attorney for Robert A. de By*
                       Law Office of John V.N. Philip. Esq.
                       260 West 91st Street, #3A
                       New York, NY 10024
                       Phone: (917) 892-1914
                       Fax: (212) 874-1602
                       E-mail: JohnPhilipNYC@aol.com

## <u>VERIFICATION</u>

ROBERT A. de BY hereby affirms that he has read the foregoing Complaint and knows the contents of the same to be true of his own personal knowledge and belief, except as to those matters affirmed on information and belief, and as to those matters, he believes them to be true.

DATED:    New York, NY
            February 12, 2020

 

_____
           ROBERT A. de BY

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b) and 81(c), Plaintiff Robert A. de By hereby demands a jury trial in the above-captioned matter.


DATED:        New York, New York
              February 12, 2020

                              LAW OFFICE OF JOHN V.N. PHILIP, ESQ.
                              By:
                                    /s/
                              _____

                              JOHN V.N. PHILIP (Bar # JP-4920)

                              *Attorney for Robert A. de By*
                              Law Office of John V.N. Philip. Esq.
                              260 West 91st Street, #3A
                              New York, NY 10024
                              Phone: (917) 892-1914
                              Fax: (212) 874-1602
                              E-mail: JohnPhilipNYC@aol.com